**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>450 Fifth Street, NW<br>Washington, DC 20530,<br><br>      Plaintiff,<br><br> v.<br><br>KOCH FOODS INCORPORATED<br>1300 W. Higgins Road, Suite 100<br>Park Ridge, IL 60068,<br><br>      Defendant. | Civil Action No.: 1:23-cv-15813 |

**COMPLAINT**

Raising chickens is a bet-the-farm proposition. Many chicken farmers must borrow hundreds of thousands of dollars to finance the construction of chicken houses—huge structures that hold over 50,000 chickens each. A farmer is largely beholden to a poultry processor, which owns the chicks, feed, antibiotics, and other inputs for raising chickens. Without a loan from the bank, there is no farm; without a contract with a processor, there is no loan; and without the processor's fair dealing, the farm may fail.

To secure better working conditions or pay, a chicken farmer's only recourse often is switching processors. Even in the best of circumstances, competition for farmers' chicken growing services is uncertain because switching processors can be a costly, risky, and difficult endeavor. But Koch Foods, a leading poultry processor, has suppressed competition even further by imposing exit penalties on its chicken farmers who want to switch to a competitor. Koch's conduct deprives farmers of the benefits of competition and lowers their compensation. Koch's

1

exit penalties are an unfair practice under Section 202(a) of the Packers and Stockyards Act and violate Section 1 of the Sherman Act. These practices should be enjoined.

## I. INTRODUCTION

1. A chicken farmer's success depends on a processor. A farmer must invest hundreds of thousands of dollars to build chicken houses to a processor's specifications. A bank will loan money for the construction only if a processor has agreed to offer the farmer a contract; the bank often sees the farmer's contract before the farmer. After obtaining a loan and building the houses, the farmer generally has no practical alternative but to accept the contract terms for growing chickens offered by the processor.

2. Once built, chickens houses cannot be relocated or readily repurposed. If the processor provides insufficient flocks, poor quality chicks, or substandard feed, the farmer may not earn enough to meet the terms of the loan—and can literally lose the farm.

3. Broiler chicken farmers, commonly called "growers," generally can contract only with a processor operating a processing facility close enough to transport chickens and feed cost-effectively.[1] Few growers have more than three other processors close enough to contract for their growing services. And when the grower wants to switch processors, alternative processors may not need new growers.

4. For these reasons, processors have substantial leverage over contract growers. Where it exists, competition among processors for chicken growers can sometimes increase their compensation and motivate a processor to provide better terms to farmers. Growers' ability to switch processors provides some check, even if a limited one.

---

[1] Most chicken farmers raise "broilers," the chickens that are slaughtered and processed for people to consume. Other chicken farmers raise breeder hens or pullets (chicks). In at least some cases, Koch imposed its exit fees on breeder-hen and pullet farmers as well as broiler farmers.

2

5. Beginning in 2014, Koch Foods—one of the five largest chicken processors in the United States—introduced an exit penalty in its grower contracts to insulate itself from competition. If a farmer switches from Koch to a different processor within 10 years (later extended to 15 years) of contracting with Koch, the farmer must pay a penalty. Depending on the size of the farm, the penalty amount can range from $24,000 to $56,000 or, for one facility's farmers, up to hundreds of thousands of dollars. Such penalties exceed 50 to 100 percent of many farmers' annual income given farmers' limited take-home pay after deducting operating expenses.

6. The goal of Koch's exit penalty is clear: Koch wants to make it more difficult for its growers to switch to another processor. Koch claims that the exit penalty was meant to compensate Koch Foods for the real impact growers leaving has on Koch. But that is just another way of saying that, without the exit penalty, Koch would have to pay farmers competitive rates to keep them from switching to one of Koch's competitors.

7. Koch has enforced its exit penalty to prevent its chicken farmers from leaving. Koch has sued or threatened to sue at least 14 farmers who wanted to switch to a competing processor. Other farmers, faced with the exit penalty and threat of litigation, have declined better opportunities with other processors and returned to Koch.

8. The exit penalty is an "unfair . . . practice or device" under the Packers and Stockyards Act, 7 U.S.C. § 192(a), because growers cannot reasonably avoid the penalty provision, its existence and enforcement substantially harm growers, and any countervailing benefit to growers does not outweigh the harm.

9. In addition, under Packers and Stockyards Act regulations, 9 C.F.R. § 201.100(h)(2), a broiler farmer has the right to terminate its poultry growing arrangement in

writing with at least 90 days' prior notice. By unreasonably burdening farmers' right to terminate their production contracts, the Koch exit penalty provision violates this regulation.

10. The exit penalty has harmed competition, and therefore suppressed compensation, for growers. Koch has a sufficient share of the relevant markets for the penalty to foreclose competition; its purpose for imposing and enforcing the penalty is to prevent or limit competition; and the penalty has prevented growers from accepting better terms. The exit penalty therefore unreasonably restrains trade in violation of Section 1 of the Sherman Act.

11. The Department of Justice brings this action on behalf of the United States and the U.S. Department of Agriculture to enjoin Koch's unlawful exit penalty practices.

## II. FACTUAL ALLEGATIONS

### A. Koch Uses Independent Farmers to Raise Its Broiler Chickens

12. Koch Foods is the fifth largest broiler chicken processor in the United States, with $4.7 billion in sales in 2022. Koch is a privately held company, whose CEO owns 99 percent of its shares.

13. Like most other broiler chicken processors, Koch is vertically integrated. This means the company controls most steps in the production of chicken meat, from hatching chicks to slaughtering and packaging broiler chickens to be consumed in homes, restaurants, and other venues. One important exception, however, is that Koch (like other major processors) pays independent farmers to raise its broiler chickens for delivery to Koch's processing plants. By outsourcing chicken growing, Koch shifts the substantial cost, capital requirements, and risk to small poultry farmers. Farmers who build chicken houses to raise chickens for Koch bear the risks of their investment, including risks of weather damage, such as tornados or floods. Outsourcing chicken growing also allows Koch to avoid the burden and costs associated with employing farmers.

14. Koch, like other processors, provides chicks and feed to its broiler farmers and pays farmers only for the service of growing chickens. To reduce transportation costs for feed and chickens, and to limit injury or death to chickens during transport, most processors contract with farmers located near each processing complex.

15. Once broiler chickens reach their target weight, Koch collects and trucks them to a processing plant, where Koch slaughters and packs them for distribution. A farmer providing broiler services for Koch gets paid only when a flock is brought to slaughter. The farmer's pay depends on the weight of the broiler chickens collected from the farmer, the farmer's "feed-conversion ratio" (that is, the weight of feed consumed by broiler chickens to their full-grown weight) relative to other local Koch-contracted farmers, and various other adjustments for items such as for fuel costs, litter control, and pest control.

16. Koch operates eight poultry processing complexes: two in Tennessee (Morristown and Chattanooga), four in Alabama (Ashland, Montgomery, Collinsville and Gadsden), one in Georgia (Pine Mountain Valley), and one in Mississippi (Morton).

17. Each of Koch's eight complexes enters into contracts with independent farmers to provide growing services. In total, more than 800 farmers grow broiler chickens for Koch. The duration of Koch's contractual commitment does not usually exceed five years. Many of these farmers operate small family farms. Koch does not allow broiler farmers in any way to own, maintain or care for any competitor's birds of any kind *anywhere*—even on property that is not used to grow chickens for Koch.

B. **Broiler Houses Are Large, Debt-Financed Capital Investments**

18. To operate at a scale sufficient to grow broilers for a major processor like Koch, a contract farmer typically needs two to four modern broiler houses. These houses are large:

5

Koch specifies that new broiler houses should generally be 66 feet wide by 600 feet long, nearly the length of two football fields.

19. Each modern broiler house costs approximately $500,000 to build. Most farmers must take out loans to fund 90 percent or more of this cost. Many chicken farmers operate as small, highly leveraged family farms, and bank debt repayment is their largest expense.

20. Koch typically provides a prospective farmer with the required specifications for the houses and a simple pro forma cash-flow statement, or "payback analysis," showing the farmer's projected total gross pay before debt service and other operating expenses. Koch then notifies a local lender, either by a commitment letter or through informal means, that Koch considers the prospective farmer acceptable and that Koch is prepared to place flocks with the farmer upon the completion of the broiler housing.

21. A lender will generally evaluate the farmer's projected cash flow based on the standard-form Koch contract, with the understanding that Koch will require the farmer to sign the contract without amendment after the houses are built. The lender generally conditions a loan for new-house construction on a farmer's willingness to execute the Koch standard contract "as is" once the new broiler houses are ready to receive their first flocks. Most loans for broiler houses span 10 or 15 years, while some are longer. As a practical matter, Koch offers contracts to farmers on a "take-it-or-leave-it" basis, and a prospective farmer typically has no opportunity to negotiate the compensation terms of a Koch contract.

22. Under its grower contracts, Koch determines a farmer's compensation for a flock after it arrives at a Koch processing plant and is weighed. Before disbursing payment, however, Koch deducts a farmer's loan payment, which it remits directly to the lender, as required by the farmer's loan agreement.

6

23. Koch wields enormous leverage over the farmers who grow its broiler chickens. Indebted farmers generally need at least six flocks each year to stay current on their broiler-house loans, yet Koch decides the number of flocks to allot to each farmer. If Koch elects not to renew a farmer's contract, or merely reduces the number of flocks placed per year, many farmers would be unable to make their loan repayments. Koch also controls other factors that can significantly affect farmer compensation, such as the number and quality of chicks provided, the type of feed, the timing of when flocks are collected, the use of antibiotics, and various payment adjustments.

24. The only realistic way for farmers to repay their loans for newly constructed broiler houses is by growing broiler chickens. Once built, broiler houses cannot be relocated, and farmers can raise chickens only for processors that are both nearby and willing to accept new farmers. Farmers know that their farm is just one among many nearby, and none is an irreplaceable supplier of broiler services for Koch or any other processor.

**C.     Koch Introduces the Exit Penalty to Stifle Competition**

25. Almost all Koch-contracted farmers reside near enough to the complex of at least one other processor to raise broilers for that processor, so there is potential competition for their broiler growing services.

26. In 2014, Koch introduced the exit penalty provision into its grower contracts—a new policy designed to weaken competition between Koch and other processors for broiler farmers' services by stymieing its farmers' ability to switch to Koch's competitors.

27. Part of a farmer's compensation is a per-flock payment that Koch calls a "New House Incentive." If the farmer switches to one of Koch's competitors in the next 10 years, the grower must pay an exit penalty:

7

> If [farmer] elects to terminate the Poultry Production Agreement during the ten (10) year time period applicable to this NEW HOUSE INCENTIVE AGREEMENT, then [farmer] shall refund Company, within 90 days of its notice of termination to Company, any payments made by Company within the preceding 12 months under this NEW HOUSE INCENTIVE AGREEMENT, and no additional amounts shall be owed by Company under this NEW HOUSE INCENTIVE AGREEMENT.

28. The fixed per-flock payment is roughly $2,000 per modern ("Class A") house. For an average farm of two or four houses, each of which receives six or seven flocks a year, the exit penalty over a year would be $24,000 to $56,000. This obligation to "refund . . . any payments" made by Koch under the "new house incentive" agreement "for the preceding 12 months" means that the exit penalty represents for most farmers *at least half*—and for some farmers *up to 100 percent or more*—of their annual take-home income after paying bank debt and operating costs.

29. The exit penalty implemented at Koch's complex in Montgomery, Alabama is even more burdensome. Koch charges Montgomery-area farmers an exit penalty equal to the "new house incentive" paid in *all years* prior to termination, rather than the amount paid in the preceding 12 months:

> If [farmer] elects to terminate the Production Agreement at any time prior during the ten (10) year time period applicable to the NEW HOUSE INCENTIVE, then [farmer] shall refund to COMPANY, within ninety (90) days of its notice of termination to COMPANY, all payments received under this NEW HOUSE INCENTIVE AGREEMENT.

Under this provision, a farmer with, say, four houses who received new house incentive payments for seven years would likely have to pay over $300,000 to switch from Koch to a competing processor.

30. As the percentage of Koch broiler farmers with qualifying houses has steadily increased, more farmers have become subject to the exit penalty. For example, by the end of

8

2017, the farmers providing more than half of the total square footage of broiler housing for Koch's Gadsden, Alabama complex were subject to the exit penalty.

31. Koch also includes exit penalties in at least some of its contracts with breeder-hen farmers and pullet farmers.

32. In rolling out the "new house incentive," Koch has sought out prospective farmers who are young, financially insecure, less familiar with the growing business, and short on collateral—making them more inclined to accept 90 or 100 percent financing from lenders. Koch understands that, for these prospective farmers, the decision to build new houses is based largely on the potential cash flow. Koch generally shows prospective farmers a "payback analysis" predicated on raising 6.5 flocks each year (that is, alternating between six and seven flocks per year), though Koch is not obligated by its contracts to deliver that many flocks.

33. Once the new houses are built, however, Koch can choose to deliver fewer than six flocks or deliver flocks that are smaller than Koch has projected. Many broiler-house loans are structured to be repaid through six flock settlements in a year; a farmer who receives fewer than six flocks frequently incurs negative cash flow and the prospect of default.

34. Koch has failed to inform some farmers of the exit penalty until the farmer has signed a loan for the new housing with the bank, drawn down the loan, and completed the construction of the new broiler houses. Koch's typical sample payback analysis is a pro forma cash flow statement that does not mention the exit penalty.

35. When a farmer finally has the opportunity to sign the lengthy broiler-services contract, the exit penalty is non-negotiable, and farmers have little choice but to accept Koch's terms given their impending loan payments. As a practical matter, it is impossible for farmers to choose not to work for Koch without defaulting on their bank loans.

9

36. Prospective farmers must trust Koch to provide reasonable contract terms when the farmer eventually receives (and signs) the Koch broiler production contract.

37. Even if farmers did receive proper notice and understood the exit penalty provision, the exit penalty would still serve as an unreasonable burden on switching.

38. The so-called "new house incentive" and concomitant exit penalty originally only applied for the first 10 years that the chicken farmer stayed with Koch. Within the past two years, however, Koch's new contracts extend the supplemental payments and exit penalty for the first 15 years that the farmer stays with Koch. Koch has also extended the supplemental payments and exit penalty to 15 years for at least some farmers who were subject to the original 10-year exit penalty obligation.

39. Koch's exit penalty makes it harder for farmers to switch from Koch to competing processors. As a result, Koch need not compete as vigorously to retain farmers as it would absent the exit penalty. In effect, the exit penalty functions as a non-compete clause that curtails farmers' ability to switch to competitors that might offer greater compensation or otherwise superior contract terms.

**D.     No Legitimate Purpose Justifies the Exit Penalty**

40. Although Koch adopted the exit penalty as part of its "new house incentive" program, Koch does not advance any funds to farmers to build new houses as part of the program. Instead, Koch expects farmers to pay for new houses by taking out their own loans on their own credit. Nor does the exit penalty serve to recoup costs that Koch has expended on special training for farmers or to protect Koch against the risk that any trade secrets or special know-how might be shared with another processor if a farmer stopped growing for Koch.

41. The "new house incentive" program has been profitable to Koch from the very first flock even without any exit penalty. With each flock, Koch saves money on feed from the

improved quality of new broiler housing. These savings far exceed the "new house incentive" payments to farmers.

42. Before adopting the "new house incentive" in 2014, Koch senior executives verified that "[t]he incentive will pay for itself with better performance," without any exit penalty. A senior employee in the Koch finance department provided Koch executives with a detailed analysis showing that only a slight improvement in the feed conversion ratio would allow Koch to break even on its "new house incentive" payments. Koch's executives responded that the program "would seem to be a no brainer," especially considering that the "improvement should be a lot higher than that."

43. Koch analyses in 2016 and 2017 confirmed that the "new house incentive" has paid for itself many times over without any exit penalty. The analyses showed that new houses provided cost savings to Koch more than seven times greater than the extra payments that Koch paid to farmers. In each year since Koch implemented the "new house incentive," Koch has saved millions of dollars. For example, by the end of 2016, less than two years after first imposing the exit penalty in its contracts, Koch determined that it had already enjoyed cost savings of many times the amount that it had paid to farmers as "new house incentives."

### E. Koch Enforces Its Exit Penalty When Farmers Seek to Switch to Competing Processors and Sues Farmers Who Do Not Pay

44. Koch actively enforces its exit penalty to deter farmers from switching to competing processors. Koch has demanded exit penalties from at least 14 farmers—including 13 from broiler chicken farmers and one from a breeder farmer—and filed nearly a dozen lawsuits over the past three years against farmers who attempted to switch processors. Some farmers returned to Koch rather than face litigation, while others declined to pursue a switch because the exit penalty would be too onerous.

45. Since at least May 2020, Koch has sent letters demanding the exit penalty from farmers who gave notice of their intention to switch to another processor.

46. In November 2020, Koch began suing farmers to collect the exit penalty. Koch sued one married couple for a total of $95,040; another farmer for $55,440; and yet another for $27,720. Since November 2020, Koch has demanded comparable exit penalties from at least nine other farmers. Some of these farmers returned to Koch rather than pay the exit penalty or bear the costs of litigation.

47. One farmer who had earned less than $4,000 in "new house incentive" payments received a demand from Koch for seven times the amount actually due under the exit penalty provision. The farmer managed to pay a lesser amount only after litigating the issue.

48. For all of these farmers, the exit penalty was substantial compared to their earnings after deducting loan payments and other costs of operating their farms.

49. Koch's highly visible efforts to collect its exit penalties have deterred farmers who might otherwise avail themselves of competition between Koch and other processors to obtain better compensation for themselves and their families. Koch's exit penalty is unfair and unreasonably harms competition for broiler farmer growing services.

## III. RELEVANT MARKETS AND MARKET POWER

50. The relevant markets are the purchases of broiler growing services in the locations encompassing each Koch poultry processing facility and the rival processors with which it competes.

### A. The Market for the Purchase of Broiler Growing Services

51. The purchase of broiler growing services by chicken processors is a relevant product market under the Sherman Act.

12

52. Broiler farmers own the facilities required to raise broiler chickens, which are typically financed by loans made directly to the farmers. Broiler farmers use houses designed specifically for growing broiler chickens that cannot be repurposed for other agricultural operations without significant cost.

53. Broiler farmers take financial risk and invest their labor and capital in building and operating a specialized farming service. Broiler farmers cannot switch to producing other agricultural products in sufficient numbers to render unprofitable a small but significant decrease in price (compensation) by a hypothetical monopsonist. Nor would farmers likely abandon their investments and credit obligations to take up alternate employment.

54. To become growers, farmers must borrow considerable amounts of money and invest time building chicken houses.

**B.  The Relevant Geographic Markets are the Areas Around the Locations of Each Koch Poultry Processing Facility and its Rival Processors**

55. Processors require sufficient growers to supply their processing complexes. Processors typically pay for the chickens' transportation, feed, veterinary care, and collection. The cost and risk of transporting feed and chickens limit the area in which processors can contract with broiler farmers. The geographic radius within which a processor can economically contract with farmers for chicken growing services constitutes its "draw area."

56. Although there may be some processor-specific requirements, top-quality chicken housing that satisfies one processor's requirements is often acceptable to other processors in the area. Farmers with top-quality housing may be able to improve their compensation by switching processors, depending on competitive conditions in the relevant market. A processor competes with a Koch complex for chicken growing services if the draw area of one or more of its complexes overlaps significantly with Koch's draw area.

57. For each Koch complex that competes with one or more rival processors, the relevant geographic market is the area around the Koch complex and its set of competing processors. Koch contracts with a significant share of the broiler farmers within the geographic market of each Koch complex.

### C. Koch has Market Power in Each Relevant Market

58. Koch contracts with a significant share of the broiler farmers who contract to deliver broiler growing services to processors within the draw area of each Koch complex.

59. Most Koch farmers have a few alternative processors with which to contract. Nearly all Koch farmers are within the draw area of at least one competitor's complex. Over 80 percent of Koch farmers are located within the draw areas of the complexes of at least two of Koch's competitors. More than half of the farmers who provide their services to Koch are located within the draw areas of the complexes of three or more of Koch's competitors.

60. Each Koch complex competes with one or more rival processors to sign up farmers who deliver growing services within their overlapping draw areas. But the Koch exit penalty artificially raises the cost to farmers to switch from Koch to a competitor. Because Koch contracts with a significant share of the farmers under contract with processors in each complex's geographic market, these switching costs significantly lessen competition in those markets.

61. Koch's market share and ability to impose and enforce the termination penalty clause establish that Koch has market power in the relevant markets.

### IV. JURISDICTION, VENUE, AND COMMERCE

62. The United States brings this action pursuant to Section 404(a) of the Packers and Stockyards Act, 7 U.S.C. § 224, upon the referral by the Secretary of the United States Department of Agriculture, and under Section 1 of the Sherman Act, 15 U.S.C. § 1, to protect the

14

farmers of the United States and to restore competition in the market for broiler growing services.

63. Koch is a privately held corporation headquartered in Park Ridge, Illinois, with live poultry operations in Alabama, Georgia, Mississippi, and Tennessee. Koch complexes enter into broiler services contracts with farmers located in multiple states, and Koch's chicken products are sold to customers in many states. Koch is engaged in interstate commerce and activities that substantially affect interstate commerce.

64. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1345, as well as 7 U.S.C. § 224, to prevent and restrain Koch from violating Section 202(a) of the Packers and Stockyards Act.

65. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1345 as well as Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Koch from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

66. The Court has personal jurisdiction over Koch under Section 12 of the Clayton Act, 15 U.S.C. § 22.

67. Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)–(c), because Koch transacted business, was found, and resided in this district; a substantial part of the events giving rise to the United States' claim arose in this district; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this district.

V.   VIOLATIONS ALLEGED

### COUNT I

### (Violation of Section 202(a) of the Packers and Stockyards Act)

68.   The United States repeats and realleges paragraphs 1 through 67 as if fully set forth herein.

69.   Koch, with its subsidiaries, is a "live poultry dealer" under 7 U.S.C. § 182(10), because it is engaged in the business of obtaining live poultry under a poultry growing arrangement for the purpose of slaughtering and processing poultry.

70.   Koch's contracts with chicken farmers concern "live poultry" under 7 U.S.C. §§ 182(6), 192, because the contracts pertain to the raising of chickens for slaughter.

71.   Koch's exit penalty is an "unfair . . . practice or device," in violation of Section 202(a) of the Packers and Stockyards Act, 7 U.S.C. § 192(a).  First, farmers cannot reasonably avoid the exit penalty.  Lenders' anticipated cash flow analyses are based on the assumption that farmers' compensation for each flock will include the "new house incentive."  Koch makes the exit penalty a condition of receiving the "new house incentive."  Farmers are required to accept the exit penalty as part of the Koch contract.  Koch sometimes even fails to disclose the exit penalty before the farmer takes out a loan to build new broiler houses.

72.   Second, the exit penalty substantially harms farmers by curtailing their ability to switch and, accordingly, pursue better wages and working conditions.  Once built, chicken houses cannot be repurposed without significant expense, and the out-of-pocket cost of paying the exit penalty is prohibitive for most farmers.  The prospect of paying Koch at least 50 percent (and, for some, 100 percent or more) of the farmer's annual take-home pay restrains the farmer from switching to a Koch competitor, even when the competing processor offers higher compensation or otherwise better contract terms.  Koch's illegal conduct has imposed substantial

costs on farmers seeking to switch processors and deprived farmers of the benefits of competition for their services.

73. Third, any purported benefit to Koch from the exit penalty does not outweigh the harm inflicted on farmers. The exit penalty does not recoup any upfront capital expenditure by Koch; farmers bear all the financial and operational risk of building new broiler houses. The efficiencies derived from new housing make Koch's "new house incentive" payments to farmers profitable for Koch from the very first flock. The exit fee thus simply insulates Koch from competition with other processors for farmers' services.

74. Koch's unfair and deceptive practices are ongoing and likely to continue and recur unless the Court grants the requested relief.

## COUNT II

### (Violation of Section 202(a) of the Packers and Stockyards Act and 9 C.F.R. § 201.100(h)(2))

75. The United States repeats and realleges paragraphs 1 through 74 as if fully set forth herein.

76. Pursuant to 9 C.F.R. § 201.100(h)(2), chicken farmers have the right to terminate their poultry growing arrangement with at least 90 days' prior written notice.

77. The Koch exit penalty provision unreasonably burdens farmers' right under 9 C.F.R. § 201.100(h)(2) to terminate the Koch production contract.

78. Koch's illegal conduct has imposed substantial costs on farmers seeking to switch and deprived farmers of the benefits of competition for their services.

79. Koch's conduct will likely continue and recur unless this Court grants the requested relief.

## COUNT III

### (Violation of Section 1 of the Sherman Act)

80. The United States repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81. The exit penalty provisions in Koch's contracts with farmers had the purpose and likely effect of unreasonably restraining interstate trade and commerce in the relevant markets, within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

82. Koch's illegal conduct has imposed substantial costs on farmers seeking to switch and deprived farmers of the benefits of competition for their services, including their compensation. Koch's illegal conduct has also reduced competition in the market for broiler services, which likely undercuts other processors' ability to hire and the compensation of farmers who do not contract with Koch.

83. Koch's conduct will likely continue and recur unless this Court grants the requested relief.

### REQUESTED RELIEF

The United States requests that this Court:

    a. adjudge that the Koch exit penalty provision in its contracts with farmers is an unfair and deceptive practice or device in violation of Section 202(a) of the Packers and Stockyards Act, 7 U.S.C. § 192(a);

    b. adjudge that the Koch exit penalty provision in its contracts with farmers is an unfair and deceptive practice or device in that it unreasonably burdens the right of farmers to terminate their "poultry growing arrangement" with Koch on 90-days' notice, in violation of 9 C.F.R. § 201.100(h);

c. adjudge that the Koch exit penalty provision in its contracts with farmers unreasonably restrains trade and commerce and therefore is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

d. permanently enjoin and restrain Koch from demanding payment of the exit penalty or otherwise enforcing the exit penalty provision;

e. enjoin Koch from including any exit penalty or substantially similar provision in its agreements with farmers;

f. require that Koch promptly give notice to all farmers with Koch contracts that contain an exit penalty provision that the exit penalty provision is unenforceable and void;

g. require Koch to take such internal measures as are necessary to ensure compliance with any injunction;

h. grant equitable monetary relief by refunding to all affected farmers any funds collected by Koch pursuant to the exit penalty provision, including any funds collected in a settlement or other resolution of a claim by Koch seeking to enforce the exit penalty provision, and all attorneys' fees and costs incurred in defending against Koch's collection efforts;

i. grant any other relief as required by the nature of this case and as is just and proper to prevent the recurrence of the alleged violation and to reverse its anticompetitive effects; and

j. award the United States the costs of this action and any other relief that the Court may deem just and proper.

Dated: November 9, 2023

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA,

/s/ Jonathan S. Kanter
JONATHAN S. KANTER
Assistant Attorney General for Antitrust

/s/ Doha Mekki
DOHA MEKKI
Principal Deputy Assistant Attorney
General for Antitrust

/s/ Michael B. Kades
MICHAEL B. KADES
Deputy Assistant Attorney General for
Antitrust

/s/ Brian R. Young
BRIAN R. YOUNG
Acting Director of Litigation

/s/ Ryan Danks
RYAN DANKS
Director of Civil Enforcement

/s/ Miriam R. Vishio
MIRIAM R. VISHIO
Deputy Director of Civil Enforcement

/s/ Daniel S. Guarnera
DANIEL S. GUARNERA
Chief, Civil Conduct Task Force

/s/ Kate M. Riggs
KATE M. RIGGS
Acting Assistant Chief, Civil
Conduct Task Force

/s/ Eun-Ha Kim
EUN-HA KIM
MARK H.M. SOSNOWSKY
   *Senior Litigation Counsel*

/s/ Jack G. Lerner
JACK G. LERNER
PETER NELSON
   *Trial Attorneys*

United States Department of Justice
Antitrust Division
Civil Conduct Task Force
450 Fifth Street NW, Suite 8600
Washington, DC 20530
Telephone: 202-227-9295
Fax: 202-616-2441
Email: Jack.Lerner@usdoj.gov